SCARLETT v. ALLEN.

1. MINES AND MINERALS—OIL WELL LEASE—CONTRACTS—CONSIDERATION.

Contractor who agreed in writing with plaintiff, as trustee for himself and others, to convey to plaintiff an interest in a lease and drill an oil well for a certain sum was not liable for difference between cost of well and amount paid him nor for share of another well he promised plaintiff when first well turned out to be a dry hole and such contingency was not provided for in the written contract since the oral promise of repayment and conveyance of interest in other well was a gratuitous promise without consideration.

2. SAME—PERFORMANCE—NEW CONTRACTS—CONSIDERATION.

After contractor's performance of written agreement to convey an interest in an oil lease to plaintiff and drill a well on the property, any further undertaking on his part required a distinct valid agreement for which a new consideration was necessary.

3. CONTRACTS—MODIFICATION.

In order to modify a contract, the new agreement must have all the requisites of a valid and enforceable agreement or not be binding.

---

Modification or rescission of contracts by subsequent inconsistent contracts, see 2 Restatement, Contracts, §§ 408, 416.

Appeal from Allegan; Miles (Fred T.), J.   Submitted October 17, 1940.  (Docket No. 105, Calendar No. 41,348).   Decided December 10, 1940.

Assumpsit by Moore J. Scarlett, trustee, against Harry R. Allen for refund under alleged oral contract.   Directed verdict and judgment for plaintiff. Defendant appeals.   Judgment vacated and cause remanded with direction to enter judgment for defendant.

*Leo W. Hoffman*, for plaintiff.

*Harry Pell*, for defendant.

BUSHNELL, C. J.   Plaintiff had a directed verdict (at the hands of a jury) against defendant in the sum of $3,463.13.   Defendant appeals from a judgment entered thereon, claiming that the court should either have directed a verdict in his behalf or granted his motion for a judgment *non obstante veredicto*.

Plaintiff Scarlett, as trustee for himself and others, arranged with defendant to drill an oil well on a 40-acre lease adjoining some wells already in production.   Defendant Allen was a driller and contractor.   A written contract was entered into, under the terms of which plaintiff and his associates were to pay defendant $10,000 for a 5/8th interest in a lease in the Monterey field and for drilling a well on the property.   The original agreement did not attempt to set forth the rights of the parties in the event the well should fail to produce oil, the agreement being silent as to such an eventuality. No mention was made in the contract of any reimbursement to plaintiff trustee of any unexpended moneys.   This written contract was fully performed by both parties thereto except as to the furnishing

of storage tanks and acid treatment, but the venture was unsuccessful, the well failing to produce any oil.

Plaintiff alleges that subsequent to the written agreement the parties entered into an oral agreement whereby defendant promised to reimburse plaintiff for sums in excess of the cost of the well. Plaintiff claims that defendant expended the sum of $6,232.55 in drilling the well and plaintiff now seeks to recover the surplus.

Rather than summarize plaintiff's testimony, we quote the following excerpts therefrom:

"*A.* Well, Mr. Allen felt very sure that that was going to be a good producing well and a good hot spot, it was right near to where these other wells were drilled and he was certain that that would make us a good well.

"*Q.* Did he tell you—did he talk at all about how much it would cost to drill it, what he wanted and what you were going to get?

"*A.* As the contract shows we were to have 5/8.
* * *

"I came to Allegan after the contract was signed and while the well was being drilled before the payment of the last $6,000. * * * He didn't have any tanks up at the well, there was no need of tanks, it was a dry well. * * *

"*Q.* * * * Now did you have any talk with Allen after this written agreement was entered into about what would happen in the event if a dry hole was drilled? * * *

"*A.* When he was drilling this particular well we had drilled, and I think Mr. Allen was sincere when he figured—he said he figured he was going to have a good producer, and in the event he didn't he was going to drill one that was. * * *

"*A.* That night he said we were going to have a good producer there and if it wasn't all we would

be in would be just simply be the cost of the well. * * *

"*A.* Well, while they were drilling in—before we gave Mr. Allen the $6,000 I had talked with him at various times there and he said—

"*Q.* Wait a minute, now you said various times, I am asking you this time just about this one time, not any other time, tell me what Mr. Allen said?

"*A.* He was sure they were going to have a good producing well there and we need not feel worried, that it was going to be a producer and if it wasn't he would see we would get one. * * *

"We came over to see Allen again and contacted him at his house here in Allegan.

"*Q.* What did you come for?

"*A.* Well, we came to find out about getting straightened up on this other one, what we could find out, and if anything we could get into another well.

"*Q.* Well, what did you have to straighten up?

"*A.* The difference of this well that was dry— that is the difference of the total cost of that well and the balance between that and the $10,000.

"*Q.* Where did you get the idea you had anything coming?

"*A.* That was Allen's conversation with us.

"*Q.* What conversation did you have with Allen about that?

"*A.* Well, if we didn't get a producing well we were to have that back, get credit.

"*Q.* Who said that? * * *

"*A.* Mr. Allen.

"*Q.* When?

"*A.* Well, that was our verbal agreement—one of our verbal agreements.

"*Q.* When did you make that verbal agreement?

"*A.* Well, that was generally understood.

"*Q.* Well, was it ever said between the parties?

"*A.* Well, it was said between Mr. Allen and myself and Mr. Weyand * * *

"*Q.* When was that said?

"*A.* As to giving you the particular date, I don't know.

"*Q.* Well, in relation to any event?

"*A.* Well, that was probably one of our trips over here, and the conversation with Allen—going back to what I have already said, that if it wasn't a good producing well we would have credit coming back. * * *

"We talked with Allen at Allegan and he felt probably not so good about the well coming in and he said he was going to have another spot at Bloomingdale and that he would cut us in on that.

"*Q.* Did you have any talk with him then about the salvage?

"*A.* Well, the salvage would be taken from this dry well over to this well he was going to drill over there. * * *

"We went over to see if we couldn't get cut in on some other well there. Previous to that he had told us the time before that—that he would have some leases over there and he would cut us in on one of those leases there and try to get us a producing well."

On cross-examination, Scarlett said:

"*Q.* You knew when you signed that contract that if you didn't hit oil you was out your $10,000, didn't you?

"*A.* Well, we—as far as that is concerned— * * *

"*A.* Yes. * * *

"*Q.* And when you signed that contract you expected to go through with it just the way it was written, didn't you?

"*A.* Yes, sir.

"*Q.* And Mr. Allen drilled you a well there, didn't he?

"*A.* It was drilled, yes, sir.

"*Q.* And he conveyed you an interest in the lease that you were to get, didn't he?

"*A.* Yes, sir. * * *

"*Q.* Now, Mr. Scarlett, what agreement did you have outside of this written agreement?

"*A.* On this particular—on the first well?

"*Q.* Yes, what agreement outside of this written agreement did you have on the first well?

"*A.* The verbal agreement that we—if this well —he was so sure this well was coming in, he said in case it shouldn't come in he would get us a well.

"*Q.* That was the agreement?

"*A.* Yes, sir..

"*Q.* And that was all the agreement, was it?

"*A.* Well, that we were to have a well. * * *

"*Q.* You had covered everything in your written agreement with Mr. Allen, hadn't you?

"*A.* I presume we had.

"*Q.* Well, you know you did, don't you?

"*A.* I suppose so.

"*Q.* There is nothing left out of that agreement you intended to put in, is there?

"*A.* I didn't make the agreement up, in fact I didn't know anything about it."

Lawrence Weyand, one of Scarlett's associates, testified that:

"*A.* We talked about it being possibly a dry hole, like they did several times before. He said, 'Well, don't worry about that, if it is we will drill another well, or give you an interest in some, or make some accounting for what this well cost and iron it out after it is all over with.'

"*Q.* According to the contract he was to put in a completed well?

"*A.* Yes.

"*Q.* Furnish tanks?

"*A.* He didn't furnish tanks because they—he said we will leave it go, there are tanks around here, we can run in if it is a producer.

"*Q.* Was that agreeable to you?

"*A.* Yes, he seemed to know what he was doing, he was a driller, we weren't drillers. He never

furnished. tanks. It wasn't necessary because we didn't get any oil. He said we could get tanks in a hurry if we needed them and we agreed to that. * * * He said, 'If you fellows are really interested in this Bloomingdale site, I have another lease. and we will figure out an investment on that,' so he figured out what the salvage would be worth, from our well, and he—the balance of it he figured around $500, and he would give us credit on our account which he owed us, and that would give us. a 1/8 interest.

"*Q.* What did you tell him about that?

"*A.* We said we would take that deal.

"*Q.* You said you would take that?

"*A.* That came in dry, we went over to see it.

"*Q.* What talk was there about using your pipe and casing?

"*A.* He used our casing as part of the deal.

"*Q.* He said he wanted $500 credit on what he owed you?

"*A.* On what he owed us."

On cross-examination, Weyand testified:

"*A.* Before we paid him the $6,000 we had a verbal agreement with him; in that verbal agreement he agreed that if the well was a dry hole he would pay us the difference. * * *

"*Q.* How much did you pay him for making another agreement with you that he was going to turn back any money to you or give you another deal?

"*A.* I can't see how you can pay him for another deal, the other deal was he owed us a balance.

"*Q.* If he owed you that much money what did you ever pay him the $6,000 for?

"*A.* Because we figured our honor was worth something, we signed the contract, we fulfilled our deal; at the time he said he would take care of us and make an accounting and see we got our investment back over and above what the well cost."

From this testimony the alleged promises of defendant are (1) to assign a 1/8 interest in a lease in the Bloomingdale field, and (2) to repay the unexpended moneys paid by plaintiff and his associates for the Monterey well, less a credit for the use of casing.

The trial judge said as to the Bloomingdale deal:

"It was after that, then these boys say to Allen, we will give you $508 and the use of these casings, and you give us a 1/8 interest in this well that you are going to drill over in Bloomingdale. All right, says Allen, and he did it, he did just as he agreed, he gives them a 1/8 interest, and he assigned it to them. That was a dry hole too."

If Allen did all that he was required to do, no recovery can be had on the Bloomingdale transaction except possibly the value of the casing which is still in the dry hole, and, as indicated by the circuit judge, will cost more to pull up than it is worth.

The most that can be said for Allen's promise to reimburse plaintiff and his associates for the unexpended moneys, et cetera, is that this was a gratuitous promise without consideration therefor. We are mindful of the argument that in the written contract Allen agreed to install storage tanks and give the first well acid treatment. From the quoted testimony, performance of this portion of Allen's undertaking was waived. There is no testimony to indicate that plaintiff's release or waiver of these items was in return for Allen's promise to repay money. The trial judge, in discussing this proposition, said:

"Now, gentlemen, the whole thing is this, is there a legal bar—now, Mr. Allen intended to pay on that, he told them they are going to have that, he told them he would pay it to them, he sent them the

statement and said it is coming to you, under the testimony in this case; but, is there a legal bar? Is there some legal block placed in the way of their recovering what they—what he generously or recklessly said he would pay them? True, there is no consideration for it, but he offered to pay it to them, told them he would if it came in a dry hole, afterwards said, I am going to do it boys, afterwards he sent the statement saying what was due; now, is there a legal block to his paying, now that he has decided not to pay? I know Allen, he had one case here in which he didn't owe these people a penny. I held he didn't owe them a penny, the Supreme Court afterwards held he didn't owe him a penny, still he offered generously, I will give you a thousand dollars, forget it, I don't care anything about a thousand dollars, so, Allen, is an impulsive man, he makes those statements, but having made this statement, is he bound to do it? There is your legal proposition. These boys never gave him anything for that promise, but of course, in reliance on that promise they have done some things, in reliance on that promise of his they went over to Bloomingdale and entered into another lease there, or bought the lease, they wouldn't have bought the lease, and gone over there and likely paid cash for it and give him the use of something they considered a $1,000; in reliance of that they made these trips and they done something they otherwise wouldn't have done. I understand, if you give a man a dollar for something worth a thousand dollars, it may not be a consideration, but if you give them a dollar for an old hat, then it is all right, then it is good consideration. Well, here is the old hat, gentlemen, these boys coming over here time after time and making these trips based upon an arrangement he never has denied, never said he wasn't going to do it, always in reliance upon it, that they done these various things.''

It is apparent that the trial judge recognized the absence of consideration and yet he directed a verdict for plaintiff. A study of the testimony requires

the conclusion that the alleged promises of Allen were vague, indefinite statements, made in the light of the disappointments and actual money losses of plaintiff and his associates, in no instance rising to the dignity of a contract.

Plaintiff argues that Allen's promise of reimbursement was a modification of the original written agreement and required no further consideration. The original agreement, however, was fully performed and any further undertaking required a distinct valid agreement for which a new consideration was necessary. As said in *Hueston* v. *Pointer Brewing Co.,* 222 Iowa, 630 (269 N. W. 754):

"In order to modify the original contract, the new agreement must have all the requisites of a valid and enforceable agreement, or it will not be binding. While no particular form is required, mere indefinite expressions cannot constitute a modification, nor can mere negotiations for a variance in the terms of the contract. The question of modification depends primarily on the intention of the parties. 13 C. J. p. 590, § 605. In addition to this, 'one party to a contract cannot alter its terms without the assent of the other; the minds of the parties must meet as to the proposed modification.' 13 C. J. p. 591, § 606."

See, also, *Heggen* v. *Clover Leaf Coal & Mining Co.,* 217 Iowa, 820 (253 N. W. 140); and *Kirchhoff* v. *Morris,* 282 Mich. 90.

The trial judge was in error in directing a verdict for plaintiff. Under the testimony, a verdict should have been directed for defendant.

The judgment entered below for plaintiff is vacated and the cause remanded with direction to enter a judgment for defendant. Costs to appellant.

Sharpe, Boyles, Chandler, North, McAllister, Wiest, and Butzel, JJ., concurred.